***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. An employee-employer relationship existed between plaintiff and defendants from January 26, 2001 to September 3, 2001, when plaintiff was released by defendants.
3. Plaintiff alleges he sustained a compensable injury to his left wrist on August 7, 2001, while employed by defendants.
4. As of the date of the incident giving rise to this claim, and during the entire period of plaintiff's employment with defendants, Cameron M. Harris Co. was the adjusting service for Legion Insurance Company, which was the carrier on the risk.
5. Pursuant to plaintiff's National Football League (hereafter "NFL") annual contract for the 2001 football season, which encompassed the dates of January 26, 2001 to February 28, 2002 or February 29, 2002, plaintiff was employed with the Carolina Panthers until September 3, 2001, when he was released from the team. Prior to that, plaintiff played with NFL Europe from March to July 2000.
6. The parties stipulated the following exhibits into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit 1 — Pre-trial Agreement
b. Stipulated Exhibit 2 — Exhibits 1-23 (tabbed and marked as one exhibit)
c. Exhibit 25 — plaintiff's 2001 W-2
d. Exhibit 26 — Spartanburg Regional Medical Center Radiology Report
e. Plaintiff's Exhibit 1 — plaintiff's history of events
f. Defendants' Exhibit A — affidavit of Sam Mills, Jr.
7. Additional stipulations were entered into by the parties on August 20, 2003:
a. Plaintiff filed an Injury Grievance proceeding against employer-defendant on September 19, 2001.
b. Plaintiff and employer-defendant settled that Injury Grievance proceeding in November 2002 for $35,294.00.
c. Employer-defendant paid the Injury Grievance settlement of $35,294.00 on November 22, 2002.
d. Plaintiff received payment of the $35,294.00 settlement from employer-defendant.
e. The Settlement and Release document signed by plaintiff on November 12, 2002 and by Marty Hurney for employer-defendant on November 20, 2002, which is attached to the stipulations of August 20, 2003 as Exhibit A, was stipulated into evidence and received by the Full Commission as additional evidence pursuant to the Full Commission's Order dated July 1, 2003.
8. The issues to be determined by the Commission are:
a. By their acceptance, and payment of plaintiff's claim for medical treatment pursuant to the North Carolina Workers' Compensation Act, whether defendants are prevented from denying the compensability of plaintiff's claim for an injury by accident;
b. On August 7, 2001, whether plaintiff sustained an injury by accident arising out of and in the course of his employment with defendants;
c. What, if any, disability proximately resulted from plaintiff's wrist injury of August 7, 2001;
d. Whether plaintiff is entitled to receive past and future medical and rehabilitative expense coverage as a result of the injury of August 7, 2001;
e. Whether plaintiff is entitled to prospective or retrospective indemnity compensation from defendants pursuant to N.C. Gen. Stat. §§ 97-31, 97-30, and 97-29;
f. Whether defendants are responsible for the cost of plaintiff's counsel's out-of-state travel to depose treating physician(s) pursuant to Cloutier v. State, 57 N.C. App. 239, 291 S.E.2d 362,disc. rev. denied 306 N.C. 555, 294 S.E.2d 222 (1982); Harvey v.Raleigh Police Dept., 85 N.C. App. 540, 355 S.E.2d 147, disc.rev. denied 320 N.C. 631, 360 S.E.2d 86 (1987);
g. Whether plaintiff is entitled to have his attorney fees taxed against defendants as costs for causing a hearing to come on for one or more of the above-referenced issues without reasonable ground, pursuant to of N.C. Gen. Stat. § 97-88.1;
h. What was plaintiff's correct average weekly wage;
i. Whether defendants are entitled to credits against any amount of indemnity compensation owed to plaintiff;
j. Whether plaintiff sustained a career-ending injury;
k. What was the basis for plaintiff's termination by defendants; and
l. Whether defendants are entitled to a credit for the amount plaintiff recovered as a result of the Injury Grievance filed against defendants.
 *********** RULING ON EVIDENTIARY MATTERS
The testimony of plaintiff regarding his conversations with Mark Kontz, chief scout for defendants, and Darren Simmons, assistant special teams coach for defendants, and the testimony of Rob Nelson, attorney and sports agent, concerning the reasons plaintiff was hired by the Panthers is admitted into evidence under the doctrine of apparent authority exception to the hearsay rule.
 ***********
Based upon the competent evidence and stipulations of the parties, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was twenty-five with his date of birth being November 5, 1976. Plaintiff was a professional football player who most recently played for defendants' professional football team, the Carolina Panthers.
2. After graduating from high school, plaintiff attended the University of Texas and graduated from its business school. While at the University of Texas, plaintiff played football as a linebacker and as a deep snapper.
3. After graduating from the University of Texas, plaintiff tried out for the Buffalo Bills NFL Team, but was cut in pre-season. Thereafter, plaintiff was drafted into the World Football League of Europe, which is owned by the NFL. In 2000, plaintiff played for the Rhyne Fire Team, of Dusseldorf, Germany, and had a productive season. Following his return from the NFL Europe, plaintiff did not receive a significant amount of interest from other NFL teams in the United States. Plaintiff's agent contacted all thirty-one NFL teams, and was unable to place plaintiff on an NFL roster. Subsequent to July 2000, plaintiff signed a contract with an XFL team, the Las Vegas Outlaws, which later released plaintiff from its team.
4. In January 2001, plaintiff was asked to try out for the NFL's Carolina Panthers, defendants in this matter, prior to signing a contract. On January 26, 2001, plaintiff was invited to defendants' locker room in Charlotte, where he was asked to exhibit his skills as a deep snapper. Following the demonstration of his skills as a deep snapper, plaintiff signed a standard NFL contract with defendants.
5. Pursuant to plaintiff's contract with defendants, had he made the team, he would have been entitled to an annual salary of $193,000.00 whether on the active or inactive rosters, and would have been entitled to $111,000.00 if he were placed on the injured reserve list.
6. Plaintiff was paid his salary in weekly installments, and had an average weekly wage of $2,134.61 per week which would entitle him to the maximum compensation rate for 2001 of $620.00.
7. Following the signing of his contract, defendants requested that plaintiff be allocated from March 2001 through July 2001 to the Scottish Claymores Football team in Europe. Plaintiff reported to that team, played and had a productive season, earning approximately $1,100.00 per week, for a season of approximately ten weeks.
8. After returning from Europe, at the request of defendants plaintiff was invited, along with approximately eighty other players, to its training camp at Wofford College in Spartanburg, South Carolina. Plaintiff arrived at camp approximately two weeks prior to August 7, 2001. Prior to that date, having not yet made the team, plaintiff was paid $800.00 in wages. Defendants were primarily interested in employing plaintiff as a deep snapper, and secondly as a backup linebacker. For the deep snapper position, plaintiff was competing against two other players for up to two openings on the roster. Defendants' long snapper was retiring and they needed someone to play both long snapper and backup linebacker.
9. At practice on August 7, 2001, plaintiff was playing defense at a linebacker position. During a particular play, plaintiff became engaged by a block from an offensive lineman.
10. At the point when the offensive player engaged plaintiff with the block, the impact caused plaintiff's left hand and wrist to be moved down and around, forcing it into what plaintiff described as an awkward position.
11. It was unexpected and unusual for the offensive player to block plaintiff with an impact that caused his left hand and wrist into an awkward position. At the time of injury, plaintiff was engaged in an activity within the scope of his employment contract and was taking reasonable measures to protect himself from injury, given the nature of the game. Plaintiff was required to do what he was doing at the time of injury and had no choice but to perform his job as best he could, notwithstanding the risk of injury.
12. Following this incident, plaintiff reported to defendants' team trainer, who felt that plaintiff had sustained a sprained left wrist. Plaintiff's left wrist was wrapped, and he returned to practice. Subsequently, plaintiff was examined by Dr. Patrick Conner, defendants' team physician, who initially felt that plaintiff sustained a fracture.
13. Dr. Connor performed x-rays, two CT scans and an MRI on plaintiff and concluded that plaintiff did not have a fracture, but instead diagnosed plaintiff with a sprain. Dr. Connor recommended plaintiff use a brace and felt his sprain should heal within a few months. Dr. Connor concluded that plaintiff could play football.
14. Dr. Connor did not feel plaintiff suffered any permanent disability. Dr. Connor speculated that if plaintiff had suffered an acute fracture, he could not have played because of the pain.
15. With conservative treatment, plaintiff's wrist continued to be symptomatic. However, plaintiff was able to continue to participate in practices for defendants, and played in all four pre-season games.
16. Subsequent to the date of his injury, while participating in practices or games for defendants, plaintiff wore a splint or thumb spica cast to immobilize his left hand and wrist. Evidence was presented that other linebackers in the NFL have played while wearing splints or thumb spica casts for the hands and wrists, and as a linebacker, plaintiff continued to be able to perform all of the activities associated with that position. While his hand was in a cast it was difficult to shed blockers or tackle and when his hand was knocked around during play, it resulted in a great deal of pain. Plaintiff's injury prevented him from being able to practice or otherwise display his abilities as a deep snapper.
17. On September 2, 2001, plaintiff was released by defendants for the stated reason that his skills or performance had been unsatisfactory as compared with other players competing for his positions on the team's roster. Plaintiff contends that his being released by defendants was directly related to his wrist injury. The greater weight of the evidence tends to show that plaintiff would have made the team but for his wrist injury and related inability to display his abilities as a deep snapper.
18. On his own plaintiff consulted Dr. Bobby J. Wroten on September 26, 2001. Dr. Wroten performed a limited bone scan and found evidence of a healing or healed fracture in plaintiff's left hand. He recommended that plaintiff continue to let his hand heal and that he refrain from playing football. The bone scan performed on plaintiff was read by Dr. Jill C. Chilcoat.
19. Following his release by defendants, plaintiff returned to Texas. In Texas, plaintiff sought additional medical treatment for his wrist. Plaintiff was examined by Dr. Bruce Prager, a physician associated with the NFL Players' Association.
20. Dr. Prager reviewed tests performed by Dr. Connor and concluded plaintiff had sustained a left wrist fracture. Dr. Prager testified that a scaphoid fracture is notorious for taking a long time to heal. He felt whether plaintiff would have been able to play with the pain was something plaintiff would have had to determine. Both Dr. Prager and Dr. Wroten advised plaintiff not to continue playing football during the season.
21. Defendants subsequently deposed Dr. Brian A. Howard and Dr. James Comas, both musculoskeletal radiologists, who examined the films which Dr. Chilcoat evaluated and testified that they felt plaintiff had no fracture in his left hand as a result of his August 7, 2001 injury by accident.
22. Plaintiff filed an Injury Grievance with the NFL Players' Association against defendants on September 19, 2001, seeking payment of the full amount of his contract for 2001 of $111,000.00 under paragraph 9 of his contract.
23. An arbitration hearing was scheduled to determine if plaintiff was entitled to his contract salary or a lesser amount. The parties reached a settlement of the Injury Grievance in November 2002 for $35,294.00 for five games, which was paid to plaintiff on November 22, 2002.
24. The nature of the NFL players' contract creates exceptional reasons as to why it is not unfair to either plaintiff or defendants to use the future earnings covered by his contract as a basis for calculating plaintiff's average weekly wage. While plaintiff claims an average weekly wage based on what he would have earned but for the injury over the terms of the entire contract including post date of injury, defendants similarly claim they are due a credit for sums paid pursuant to the same contract under paragraph 10 after the date of plaintiff's compensable injury by accident.
25. Paragraph 9 of plaintiff's contract with defendants reads:
 INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contact, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.
26. Paragraph 10 of plaintiff's contract with defendants reads:
 WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.
27. The NFL Management Council and the NFL Players' Association differ on their interpretation of paragraph 10 of the player's contract. Dennis Curran, senior vice-president of the NFL Management Council, testified that the settlement amount was paid out of defendants' gross revenues and that therefore defendants are entitled to a credit. Mr. Curran interprets paragraph 10 to entitle defendants to a dollar-for-dollar offset for workers' compensation paid to plaintiff. Richard Berthelsen, general counsel for the NFL Players' Association, testified that since the settlement under the Injury Grievance was paid out of the players' share of gross revenues, defendants are not entitled to any credit for this payment. In the alternative Mr. Berthelsen interprets paragraph 10 not to entitle defendants to a dollar-for-dollar credit, but a credit for the number of weeks which a player is paid under paragraph 9. Mr. Berthelsen further testified that there is no requirement that a player make the team to be entitled to recover under paragraph 9.
28. The Full Commission finds that the Injury Grievance monies paid to plaintiff came from the gross revenue earned by the Panthers from professional football games. The gross revenue is put into a mathematical formula to determine the players' salary cap for each football season. Plaintiff did not contribute to the salary cap for the Panthers. The salary cap is an aggregate limit on what can be paid to the players. Individual players negotiate their own salaries, depending upon their skill and abilities. All the players' salaries and benefits on the team cannot exceed the limit mandated by the salary cap. Plaintiff was paid salary and benefits out of money that was designated as money that can be paid to players, but no percentage of his salary was put into the fund to pay for benefits. Therefore, defendants are entitled to a credit for payments "made by the employer" pursuant to N.C. Gen. Stat. § 97-42.
29. Based upon the greater weight of the credible evidence of record, defendants paid plaintiff $35,294.00 for five weeks of salary for which defendants are entitled to receive a credit for workers' compensation benefits that were due and payable.
30. N.C. Gen. Stat. § 97-42 provides in part that:
 Unless otherwise provided by the plan, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week (emphasis added).
In the case at bar, paragraph 10 of the plan (player's contract) does provide for a method other than the statutory method and states that the credit shall be the amount of the payment made under the contract. Therefore, because the plan provides for a credit based upon the payment itself, pursuant to N.C. Gen. Stat. § 97-42 the credit is not based upon the number of weeks for which plaintiff was paid, but rather defendants are entitled to a credit for the $35,294.00 settlement paid to plaintiff on a dollar-for-dollar basis.
31. The greater weight of the medical evidence of record supports a finding that plaintiff sustained a fracture to his left wrist as the result of the incident occurring on August 7, 2001.
32. Following his return to Texas, plaintiff looked for work but was unable to obtain other employment until approximately January 2002. At that time, plaintiff became employed on a commission basis as a real estate broker, which yielded one sale for which he had not been paid of approximately $100.00, and a second sale, which resulted in two payments of $1,100.00.
33. The Full Commission finds that the fracture of plaintiff's wrist was an unlooked for and untoward event that was not expected by plaintiff. Therefore, on August 7, 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendants.
34. As the result of the compensable injury by accident, plaintiff was partially disabled from employment and was earning reduced wages when he returned to employment in January 2002. His diminished ability to earn wages is due to his disability resulting from the compensable injury by accident.
35. Counsel for plaintiff incurred costs relating to out of state travel for the taking of depositions.
36. Defendants' actions in defense of this matter have been reasonable and were not indicative of stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendants on August 7, 2001. N.C. Gen. Stat. § 97-2(6). Although an injury sustained while playing football may not be an unusual occurrence, such injury is not a probable, intended consequence of the employment and constituted an unlooked for and untoward event that was not expected or designed by plaintiff. See, Searsey v. ConstructionCo., 35 N.C. App. 78, 239 S.E.2d 847 (1978); Pro-Football, Inc.,T/A Washington Redskins and Gulf Insurance Company v. Jeffrey A.Uhlenhake, 37 Va. App. 407, 558 S.E.2d 571 (2002), aff'd,265 Va. 1, 574 S.E.2d 288 (2003).
2. As the result of the compensable injury, plaintiff was partially disabled and is entitled to partial disability compensation for 300 weeks dating from August 7, 2000, the date of his initial injury by accident, at the rate of $620.00 per week, the maximum rate in effect during the year 2001. N.C. Gen. Stat. § 97-30.
3. Defendants are entitled to a dollar-for-dollar credit for the settlement amount of $35,294.00 paid to plaintiff under the player's contract which shall be deducted from the end of the 300-week period under N.C. Gen. Stat. §§ 97-30 and 97-42.Larramore v. Richardson Sports Ltd. Partners, 141 N.C. App. 250,540 S.E.2d 768 (2000), aff'd per curiam, 353 N.C. 520,546 S.E.2d 87 (2001).
4. Exceptional reasons exist for using the method used herein for calculating plaintiff's average weekly wage that most accurately approximates the amount which plaintiff would be earning were it not for the injury he sustained. N.C. Gen. Stat. § 97-2(5). Plaintiff's average weekly wage should be determined from the amount he would have earned if he had continued to play football for defendants. This is the approach previously applied by the Commission for professional football players, which was affirmed on appeal. Larramore v. Richardson Sports Ltd. Parners,supra.
5. Because defendants' actions in defense of this matter have been reasonable and not indicative of stubborn, unfounded litigiousness, plaintiff is not entitled to the award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
6. Counsel for plaintiff is not entitled to be reimbursed by defendants for costs incurred traveling out of state for the taking of depositions. The award of such expenses as part of the costs of depositions is discretionary pursuant to N.C. Gen. Stat. § 97-80. There was no showing by plaintiff that exceptional reasons existed for taking the depositions in person rather than the usual practice of taking out of state depositions by telephone. The case at bar is distinguishable from Cloutier v.State, 57 N.C. App. 239, 291 S.E.2d 362, disc. rev. denied,306 N.C. 555, 294 S.E.2d 222 (1982), in which plaintiff's attorney was allowed reimbursement for travel out of state where the Commission ordered the taking of a deposition in Florida.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay directly to plaintiff partial disability compensation at the maximum rate of $620.00 per week in effect during the year 2001 for a period of 300 weeks from August 7, 2000, the date of his injury by accident, subject to the attorney's fee awarded below. Any amount that has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall receive a dollar-for-dollar credit for the settlement amount of $35,294.00 already paid plaintiff to be deducted from the end of the 300-week period.
3. Defendants shall pay 25% of the accrued amount due plaintiff in Paragraph 1 of this award directly to plaintiff's counsel. Thereafter, defendants shall send every fourth compensation check to plaintiff's attorney.
4. Defendants shall pay all medical and related expenses resulting from plaintiff's compensable injury by accident for so long as such treatment affects a cure, gives relief or tends to lessen plaintiff's period of disability.
5. Defendants shall pay the costs.
This the ___ day of May 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/kjd